## Abdallah's Naturalization.  Barniak's Naturalization.

*Naturalization—Applicants with wives or minor children living in foreign countries—Eligibility—Department of Labor.*

1. The power to naturalize aliens is judicial, and not ministerial or clerical.

2. Applicants for naturalization who are eligible to citizenship and have complied with all the formalities of the law are entitled to be naturalized, although they may have wives or minor children living in foreign countries.

3. The position of the Department of Labor that aliens with wives or minor children living in foreign countries cannot, or at least should not, be naturalized, is untenable.

Petitions for naturalization.  Q. S. Phila. Co., Nos. 13273 and 13280.

*A. E. Stephens*, U. S. Naturalization Examiner, for the Government.

STERN, P. J., May 11, 1925.—The petitioner, Joseph Abdallah, filed his declaration of intention to become a citizen (No. 53254) in the District Court of the United States, at Philadelphia, on Feb. 25, 1920, and his petition for naturalization (No. 13273) on Sept. 30, 1924. He was born at Mt. Lebanon, Syria, and is fifty-two years of age. He arrived in this country on Oct. 9, 1909, and has resided in Pennsylvania, and, therefore, in the United States, continuously since that date. His occupation is that of a laborer.

The petitioner, Kerian Barniak, filed his declaration of intention to become a citizen (No. 7134) in the District Court of the United States, at Philadelphia, on June 12, 1922, and his petition for naturalization (No. 13280) on Oct. 7, 1924. He was born in Eastern Galicia (then a part of Austria), and is thirty-seven years of age. He arrived in this country on July 1, 1913, and has resided in Pennsylvania, and, therefore, in the United States, continuously since that date. His occupation is that of a laborer.

These applicants were heard in open court on Feb. 27, 1925. That they had complied with all the formalities of the law and were in every respect entitled to citizenship was admitted, except as to one contention of the Government hereinafter set forth. They had each filed proper declarations of intention and petitions for naturalization, and had each been continuously within the boundaries of the United States, the one for more than fifteen, the other for more than eleven years. Their papers, and the testimony taken at the hearing, disclosed that they had no beliefs or views of government proscribed by the naturalization laws; they were admittedly of good moral character, "attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the same;" they spoke the English language; and each produced the required two witnesses, citizens of the United States, as to the facts of residence, moral character and attachment to the principles of the Constitution.

The representative of the Government, however, objected to their admission to citizenship because of the fact that the petitioner Abdallah has five children, aged, respectively, sixteen, twenty, twenty-one, twenty-six and twenty-seven years, all of whom are now living, and have always lived, at Mt. Lebanon, Syria (his wife is deceased); and the petitioner Barniak has a wife, who, although previously in this country, now resides in Poland (he has no children). Upon inquiry from the court as to the relevancy of these facts, the Government representative called the court's attention to a memorandum from the Assistant Secretary of Labor to the Commissioner of Naturalization, dated Feb. 2, 1924, and to a letter of instructions from the Commissioner of Naturalization to all examiners and clerks in the naturalization service, dated Feb. 19, 1925. The court was of opinion that the observations and arguments

contained in said memorandum and circular letter were without merit, and, accordingly, being convinced that the applicants possessed the necessary qualifications for naturalization, and that they gave promise of good citizenship, the court thereupon, to wit, on Feb. 27, 1925, ordered that the petitioners, having taken the oaths required by law, be, and they then and there were, admitted to become citizens of the United States. The representative of the Government asked the court to file an opinion setting forth the reasons upon which its action was based, and this opinion is filed in accordance with that request.

The contention of the Government, as outlined in the memorandum and circular letter above referred to, is that, as a matter of policy, it is undesirable to admit to citizenship applicants whose wives or children have not been residents of this country, and that, as a matter of law, they are ineligible for admission. A more detailed consideration of the memorandum and letter reveals that they are curious documents.

The memorandum from the Assistant Secretary of Labor to the Commissioner of Naturalization, dated Feb. 2, 1924, sets forth that:

"Whatever virtue there may have been in the plan for not naturalizing aliens who had wife or minor children, or both, in Europe when the plan was first adopted, there are ten-fold more reasons now under the existing immigration law. At the time when the naturalization of the man here made his wife a citizen, the matter was settled. Under present practice, when the wife of a naturalized citizen arrives and she is inadmissible for any reason, including the quota law, it creates an almost impossible situation. As a matter of law, we may not admit her, but as a matter of fact, they all are admitted, because, thus far, no public officer has been found able to stand up under the everlasting hammering of hundreds of public officers and millions of American citizens who are shocked beyond expression at the thought that the wife of an American citizen should be denied admission. They care not that the law prohibits it. The truth of the matter is, cases of this kind almost wreck the machinery of the immigration service.

"The situation with reference to their children is not changed by the change in the law. It is also true that almost without exception, where a man has been naturalized while he had wife or minor children abroad, some one in that family proved inadmissible on arrival. No doubt, many aliens ask for naturalization with honest purposes, so far as their family abroad is concerned, but the bulk of them ask for it under those circumstances for the sole purpose of putting the immigration forces of America over a barrel."

The memorandum in question also states:

"They (citizens, and aliens who have declared their intention to become citizens) both stand on exactly the same basis, so far as visa of passports is concerned. The only difference is, as above indicated, when the members of the family of an American citizen arrive, they swing a nastier club over the immigration officers than do those who are not yet naturalized."

Passing by, without comment, the bizarre phraseology of this memorandum; passing by, likewise, the peculiar point of view that the "bulk" of aliens ask for naturalization "for the sole purpose of putting the immigration forces of America over a barrel" (whatever may be the meaning of that phrase); passing by, likewise, the extravagant exaggeration contained in the statement that "almost without exception" some one in the family of the naturalized citizen proved inadmissible on arrival; passing, further, the serious imputation upon our public officials that, thus far, "no" public officer has been found able to "stand up" and execute the law; passing, finally, the supercilious reference to "millions of American citizens" being "shocked beyond

expression at the thought that the wife of an American citizen should be denied admission," we come to the basic weakness in the argument set forth in the memorandum that naturalization should be refused to a person, even though entitled thereto under the law, for the sole reason that if such naturalization be granted, and if the newly-made citizen attempts to bring his family to this country, and if there prove .to be among them some who, for other reasons, are inadmissible, it is possible that the latter may be improperly admitted because, "thus far, no public officer has been found able to stand up under the everlasting hammering of hundreds of public officers and millions of American citizens who are shocked beyond expression at the thought that the wife of an American citizen should be denied admission." In other words, because there are many people whose humanitarian sympathies lead them to try to induce immigration officials to admit persons whom these officials believe to be legally disqualified, and because the officials may weakly give way to such importunities, therefore, an applicant for citizenship, even though legally entitled to naturalization, should not receive it! This would not only appear to be a process of peculiar reasoning, but it also indicates a strange sense of justice. Take, for example, the present case of Abdallah. He has lived in this country for more than fifteen years; came when he was entirely welcome, and, no doubt, has prospered here; but it is now asked that he should be denied citizenship merely in order to prevent his possibly attempting to bring over his minor children, and his possibly seeking to induce officials improperly to admit such as may not be qualified to enter. The obvious purpose, therefore, is to compel him either to remain apart from his younger children or, if he does not wish to be forever separated from them, to return to his native land and thereby relinquish the fruits of the fifteen years' residence which he has had in this country and of the position which he has here laboriously built up. And all this merely because the officials of the immigration establishment may be "hammered" into overlooking the provisions of the law in case any of the minor children applying for admission should not be qualified to enter!

We now come to a consideration of the circular letter of the Commissioner of Naturalization to all examiners and clerks in the naturalization service, dated Feb. 19,.1925. Our first observation is that this letter is also unusual, in that it instructs the persons to whom it is addressed to make a special report to the naturalization office of every case in which the judge overrules the objection to the admission of a petitioner whose family resides abroad and never lived in the United States and admits such petitioner to citizenship, and it further calls upon examiners to "report the court and name of the judge or judges adhering to the Assistant Secretary's views." What the implication contained in this request is may be left to the imagination. The office of the Commissioner of Naturalization should be reminded of the fact that the power to naturalize aliens is judicial and not ministerial or clerical.

The circular letter goes on to refer to a memorandum of the Assistant Secretary of Labor, acting as Secretary, to the Commissioner of Naturalization, dated Jan. 31, 1925, which is as follows: "I want to repeat what I have said frequently to you, that an alien whose family is in Europe has never lived in the United States, no matter how many years he may have been here. He cannot be naturalized, because he has not complied with that requirement of the statute that he must have resided here five years. It is the common law of the United States and the common law of the world and decent philosophy and sound doctrine that a man resides where he has his family and maintains his family."

Justices' Costs.

This is obviously an attempt on the part of the Department of Labor to establish a legal basis for exclusion from naturalization in such cases, instead of allowing the matter to rest merely upon the argument of policy enunciated in the memorandum of Feb. 2, 1924. In order to accomplish this, the department takes the ground that naturalization should be refused where the applicant's family is living abroad, because the alien in such a case "has not complied with that requirement of the statute that he must have resided here five years." The interesting proposition is advanced that the domicile of the husband and father follows that of his wife and children, and this is stated to be "the common law of the United States and the common law of the world and decent philosophy and sound doctrine."

As to this proposition constituting the common law of the United States, it is sufficient to state, what every tyro in the study of law knows, that exactly the reverse is true, namely, that the domicile of the husband or father determines the domicile of his family.

As to its being the "common law of the world," it would be interesting to know what is meant by such an expression, since heretofore no one has supposed that there was any "common law of the world."

As to its being "decent philosophy," the adjective is scarcely used with appropriateness, since philosophy is presumably a science, and one speaks of the accuracy or falsity of alleged scientific fact or hypothesis rather than of its "decency" or indecency.

As to its being "sound doctrine," opinions may differ. If, however, it be "sound doctrine," it is peculiar that the common law of Anglo-Saxon peoples throughout generations of recorded history has never so considered it, but has held exactly to the contrary.

On the whole, it seems regrettable that a statement as to what constitutes the law should be sent out by a department of the Federal Government to all of its "examiners and clerks" without more consideration than seems in the present instance to have been given to the subject.

Since the applicants possess all of the necessary qualifications for admission to naturalization, since there is apparently no sound policy which would dictate the denial to them of their fair rights, and since, no matter what may be conceived to be the best "policy," it is the duty of the courts to follow the law as it is written in the statute books, the court has admitted these two applicants to citizenship.